UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| KENNETH GARLAND, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 1:18-cv-00428-SEB-DLP |
| WEXFORD OF INDIANA, et al. | ) | |
| Defendants. | ) | |

**Order Granting Defendant Corizon's Motion for Summary Judgment,
Granting in Part Defendants Dr. Ippel and Wexford's Motion for Summary Judgment,
and Denying in Part Defendants Dr. Ippel and Wexford's Motion for Summary Judgment**

Plaintiff Kenneth Garland, an inmate at New Castle Correctional Facility, filed this 42 U.S.C. § 1983 action alleging that since February 14, 2016, the defendants have been deliberately indifferent to his two medical conditions: ulcerative colitis and an unidentified ailment that caused severe limb pain.

Some of Mr. Garland's claims were dismissed at screening, and summary judgment was granted on other claims based on Mr. Garland's failure to exhaust administrative remedies. Mr. Garland's remaining claims are that (1) Corizon Inc. and Wexford of Indiana were deliberately indifferent by not providing immunoglobulin therapy for his limb pain, (2) Wexford was deliberately indifferent by not providing medicated wipes to alleviate his ulcerative colitis symptoms, and (3) Dr. Bruce Ippel was deliberately indifferent by denying his request for a high-protein, low-carb, renal diet. The remaining defendants have moved for summary judgment as to these claims. For the reasons below, the Court grants summary judgment as to Claims 1 and 3 but denies summary judgment as to Claim 2.

# I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a). A party must support any asserted undisputed (or disputed) fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609−10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573−74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3).

## II. Factual Background

Mr. Garland alleges deliberate indifference by Corizon from June 2016 through March 31, 2017. Dkt. 69-30 at 52 (Garland deposition). On April 1, 2017, Wexford took over for Corizon as the contracted medical provider at New Castle. *Id.*; *see also* dkt. 69-1, ¶ 3 (Ippel affidavit). Mr. Garland alleges deliberate indifference by Wexford and Dr. Ippel on and after April 1, 2017.[1]

### A. Treatment under Corizon (June 2016 to March 31, 2017)

In the summer of 2016, Mr. Garland was 5'10" tall and weighed 120 pounds. Dkt. 69-30 at 56−57. He had diarrhea 12 to 20 times per day because of his ulcerative colitis. *Id.* Corizon medical providers continued Mr. Garland's prescriptions of Zantac and Colazol for this condition. Dkt. 64-2 at 8 (medical records). Mr. Garland also used a wheelchair because of pain and muscle atrophy in his legs, which was caused by some other, unidentified condition. *Id.*

In June 2016, an outside specialist diagnosed Mr. Garland with autoimmune neuropathy and recommended immunoglobulin therapy (because Mr. Garland reported to the specialist that it had alleviated his symptoms once before). Dkt. 69-30 at 53. During immunoglobulin therapy, the patient receives an intravenous supply of immunoglobulin harvested from others' blood. *Id.* at 70−71. The treatment can cause severe allergic reactions, anaphylactic shock, and death. *Id.* at 71.

On August 9, 2016, Dr. Ippel saw Mr. Garland for a chronic care visit. Dkt. 64-2 at 20. Dr. Ippel ordered tests for Mr. Garland's ulcerative colitis and a neural evaluation for his limb condition. *Id.* Based in part on Mr. Garland's allergies and the risk of allergic reactions during immunoglobulin therapy, Dr. Ippel did not order the treatment. Dkt. 69-1, ¶¶ 49−50.

---

[1] Dr. Ippel provided treatment beginning in July 2016 on behalf of Corizon. Mr. Garland's claims against Dr. Ippel, however, cover only the treatment Dr. Ippel provided on behalf of Wexford beginning April 1, 2017. *See* dkt. 71 (Mr. Garland asserting that his diet claim against Dr. Ippel alleges deliberate indifference "after Corizon's contract ended with the IDOC").

On November 7, 2016, a nurse practitioner saw Mr. Garland for a chronic care visit. *Id.* at 30. The nurse practitioner noted a 20-pound increase in Mr. Garland's weight since his admission to New Castle. *Id.* The nurse practitioner ordered a gastrointestinal consultation for Mr. Garland's ulcerative colitis. *Id.* at 32.

On November 30, 2016, Dr. Ippel examined Mr. Garland. *Id.* at 34. Dr. Ippel prescribed pyridoxine and Benadryl for Mr. Garland's limb condition. *Id.* Dr. Ippel noted that the current treatment program for Mr. Garland's limb condition was "relatively safe and effective." *Id.* He also noted that the ulcerative colitis had "improved quite a bit." *Id.* Dr. Ippel ordered a peanut-free diet, despite a negative allergy test, because Mr. Garland reported that peanut butter worsened his ulcerative colitis. *Id.* at 34, 36.

On December 13, 2016, Mr. Garland was sent to an off-site neurologist, Dr. Marc Cohen. *Id.* at 40. Mr. Garland told Dr. Cohen that immunoglobulin therapy eliminated the symptoms of his limb condition for a month when he received it in 2013. *Id.* But Dr. Cohen did not recommend immunoglobulin therapy because of its intensity and serious side effects. Dkt. 69-30 at 70. Instead, he first wanted to see if medication worked. *Id.* Dr. Cohen recommended EMG and MRI scans, as well as the drug Lyrica. Dkt. 64-2 at 44. The EMG and MRI scans did not reveal a neurological condition, which is what had been previously diagnosed. *Id.* at 51−52.

On January 17, 2017, Mr. Garland sent a letter to medical staff refusing to take any medicine that was handed out by medical staff in the medication line. Dkt. 64-2 at 58. He asserted that he would take only "KOP" ("keep on person") medication. *Id.* Medical staff discontinued Mr. Garland's prescriptions for Cymbalta and Benadryl. *Id.* at 59−60.

On March 15, 2017, Mr. Garland saw Dr. Ippel for his ulcerative colitis and limb condition. *Id.* at 65. Regarding the ulcerative colitis, Dr. Ippel noted that current treatment "seemed to control

[Mr. Garland's] symptoms for the most part, although he continues to have possibly dietary related loose stools at intervals." *Id.* Regarding the limb condition, Dr. Ippel noted that "[Mr. Garland] is currently clinically stable and in no distress and functions relatively well with some assistance." *Id.* Dr. Ippel ordered EMG studies and prescribed Lyrica, among other medications. *Id.* at 65, 68. Two days later, Dr. Ippel informed Mr. Garland that the Lyrica prescription had been replaced with Cymbalta. *Id.* at 69; *see also id.* at 73 (Mr. Garland agreeing to take Cymbalta).

On March 22, 2017, Mr. Garland requested an appointment with Dr. Ippel and stated "[Cymbalta] is not the med for me" because it increased the pain in his limbs. *Id.* at 75.

On March 28, 2017, Mr. Garland underwent a colonoscopy at Reid Health. *Id.* at 76. Dr. Eileen Cravens recommended a prescription for Humira or Azathioprine on top of Mr. Garland's current treatment plan. *Id.* at 80.

### B. Treatment under Wexford (on and after April 1, 2017)

By April 7, 2017, Mr. Garland had been prescribed Azathioprine for his ulcerative colitis, as recommended by Dr. Cravens. Dkt. 69-5 at 1. On April 7, Dr. Ippel discontinued Mr. Garland's Cymbalta prescription and continued a course of steroid pulsing, which had been helping the limb condition. *Id.*

On April 13, 2017, Mr. Garland was sent to see Dr. Blankenship for an EMG and other tests to diagnose Mr. Garland's limb condition. Dkt. 69-7. Dr. Blankenship's report indicated no evidence of abnormality, including no evidence of radiculopathy, polyneuropathy, entrapment neuropathy, myopathy, or plexopathy. *Id.*

On April 18, 2017, Mr. Garland saw Dr. Ippel for a chronic care visit. Mr. Garland's weight was 146 pounds—declining but still in the healthy range. Dkt. 69-8 at 1−2. He continued to suffer limb pain and continued to use a wheelchair most of the time.

On April 20, 2017, Mr. Garland complained that he was out of medicated wipes. Dkt. 69-9. Wipes were provided through July 25. Dkt. 69-10.

On June 2, June 16, and June 30, 2017, Mr. Garland received Humira injections. Dkts. 69-11, 69-13, and 69-14.

On June 9, 2017, Dr. Ippel renewed Mr. Garland's medical order for a peanut-free diet. Dkt. 69-12.

On July 21, 2017, Mr. Garland saw Dr. Ippel for a chronic care visit. Mr. Garland reported a 50% reduction in ulcerative colitis symptoms. Dkt. 69-16 at 1. He requested a reduced-grain, peanut-free diet. *Id.* He remained in a wheelchair. *Id.* Dr. Ippel prescribed Keppra, an anti-epileptic medication, to address Mr. Garland's limb pain. Dkt. 69-1, ¶¶ 34, 35; dkt. 69-16 at 4.

On August 11, 2017, Mr. Garland received an Humira injection. Dkt. 69-18. But he refused the injection scheduled for September 1. Dkt. 69-19.

On September 13, 2017, Mr. Garland saw Dr. Ippel for a chronic care visit. Mr. Garland expressed satisfaction with the Keppra prescription, stating that it was effective and produced fewer side effects than previous treatments. Dkt. 69-20 at 1.

On October 17, 2017, Mr. Garland saw Dr. Ippel for a chronic care visit. Dr. Ippel noted that "current treatment is working pretty good these days." Dkt. 69-22 at 1. Mr. Garland reported that he was walking with a cane for an hour each day. *Id.* At Mr. Garland's request, Dr. Ippel discontinued Humira and ordered "relatively rare" steroid pulsing to treat the limb condition. *Id.*

On October 24, 2017, Mr. Garland complained that he was out of medicated wipes. Dkt. 69-23. Two packages were provided to him. *Id.* Sometime after this date, Wexford implemented a policy restricting medicated wipes to inmates who, unlike Mr. Garland, were housed in the prison infirmary.

On February 27 and April 2, 2018, Dr. Ippel renewed Mr. Garland's renal pre-dialysis, peanut-free medical diet. Dkts. 69-24, 69-25.

On April 11, 2018, Dr. Ippel discontinued Mr. Garland's Keppra prescription because Mr. Garland had stopped taking it. Dkt. 69-26.

On April 12, 2018, Mr. Garland weighed 167 pounds. Dkt. 69-27 at 2. A nurse practitioner reported that Mr. Garland was "[t]olerating diet well, gaining weight." *Id.* at 1. The same nurse practitioner requested a high-protein, low-carb, renal diet. Dkt. 69-28 at 1. That request was denied by the regional medical director. *Id.* at 3.

On May 18, 2018, Mr. Garland received two packages of medicated wipes. Dkt. 69-29. These were the first wipes he had received since October 24, 2017.

On August 22, 2019, Mr. Garland reported that he was taking prescription vitamins and an iron supplement for his limb condition. Dkt. 69-30 at 11−12, 46−47. He was no longer using a wheelchair and had returned it to medical. *Id.* at 47. He still used the cane "occasionally, but not for everyday use for the most part." *Id.* at 48. He was walking between one and three miles per day. *Id.* He weighed 180 pounds but still experienced some symptoms of ulcerative colitis. *Id.* at 28−30. His "ideal diet" would be a high-protein, low-carb, renal diet. *Id.* at 28.

### III. Discussion

To prevail on an Eighth Amendment claim based on deliberate indifference to serious medical needs, a plaintiff must show that (1) he suffered from an objectively serious medical condition and (2) the defendant knew about his condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Knight v. Grossman*, 942 F.3d 336, 340 (7th Cir. 2019). Negligence is not enough. *Knight*, 942 F.3d at 340. "A prison

official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 837).

Because Wexford and Corizon act under color of state law by contracting to perform a government function—providing healthcare services to inmates—they are treated as government entities for purposes of 42 U.S.C. § 1983 claims. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019). A successful claim against Wexford or Corizon therefore must be based on a policy, practice, or custom that caused a constitutional violation. *Id.*; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).

Mr. Garland alleges that he was denied immunoglobulin therapy because Corizon and Wexford maintained an unconstitutional policy of denying effective but expensive treatment. He alleges that he was denied medicated wipes because Wexford maintained an unconstitutional policy of denying medical items to inmates not housed in the infirmary. And he alleges that Dr. Ippel was deliberately indifferent by not ordering him a high-protein, low-carb, renal diet. The Court will address each claim in turn.

**A. Immunoglobulin Therapy**

In his complaint, Mr. Garland alleged that Corizon and Wexford maintained a policy of failing to provide effective but expensive treatment and that, because of this policy, they failed to provide him with immunoglobulin therapy. Dkt. 1 at 6. But in summary judgment briefing, he backs away from the allegation of an unconstitutional policy. Dkt. 72 at 6 (response to motion for summary judgment) ("Garland is not alleging a widespread policy of mistreatment, but that this specific denial of an effective treatment violated his rights."). Regardless, Mr. Garland points to no evidence that would allow a jury to find in his favor on this policy claim.

Dr. Ippel asserts in his affidavit that he exercised his medical judgment in declining to order immunoglobulin therapy for Mr. Garland. Dkt. 69-1, ¶¶ 49−50. Immunoglobulin therapy is a risky treatment, and Mr. Garland's various allergies increase the risk. *Id.* Indeed, two outside specialists also declined to recommend immunoglobulin therapy. Dkt. 69-30 at 70 (Dr. Cohen recommending medication before considering immunoglobulin therapy, given immunoglobulin therapy's intensity and side effects); dkt. 69-7 at 1 (Dr. Blankenship finding no evidence of neurological abnormality). To be sure, Mr. Garland reports immunoglobulin therapy was effective in 2013, and another specialist recommended it for that reason. Dkt. 69-30 at 53. But disagreement between medical providers about the proper course of treatment is not enough to show deliberate indifference unless one of them is failing to exercise medical judgment. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Notably, the specialist who recommended immunoglobulin therapy did so based on an apparent misdiagnosis. Dkt. 69-30 at 54 (specialist agreed with prior diagnosis of idiopathic polyneuropathy). And Mr. Garland's symptoms now have been eliminated with no more than a vitamin regimen. Dkt. 69-30 at 11−12, 46−47. Mr. Garland's complaints about the delayed resolution are understandable, and his treatment may not have been perfect. But no jury could find that the medical providers ignored his symptoms. Mr. Garland was sent to two outside neurologists and provided with a series of treatments in search of a safe, effective option. Corizon and Wexford are therefore entitled to judgment as a matter of law on this claim.

**B. Medicated Wipes**

Mr. Garland asserts that his ulcerative colitis causes bloody stools and diarrhea. Dkt. 69-30 at 12; *see* dkt. 72 at 4 ("chafing, bleeding, pain, and risk of serious infection in the perineal area"). To alleviate the pain associated with these symptoms, Mr. Garland regularly receives medicated

9

wipes to use after bowel movements. But in late 2017, Wexford instituted a policy that did not allow prisoners medicated wipes unless they were housed in the infirmary. Dkt. 69-30 at 33−36. This policy left Mr. Garland without medicated wipes for several months. *See* dkt. 69-23 (two packages provided October 24, 2017); dkt. 69-29 (two packages provided May 14, 2018).

Wexford argues that, at least for non-infirmary inmates, medicated wipes are mere convenience items. Dkt. 68 at 20; dkt. 73 at 4. But Mr. Garland states that the wipes offer significant pain relief. Dkt. 72 at 4. And exposing an inmate to preventable, unnecessary pain can constitute deliberate indifference. *See Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012).

Wexford also argues that Mr. Garland showed weight gain and decreased symptoms over the period he was denied medicated wipes. Dkt. 73 at 4. But that does not negate the alleged pain Mr. Garland suffered during and after bowel movements during that time. Regardless, Wexford's temporary policy was categorical. They cannot now recast it as medical judgment based on Mr. Garland's improved symptoms.

Wexford is not entitled to summary judgment on this claim.

**C. Diet Request**

Mr. Garland's complaint alleged that Dr. Ippel refused to request a low-carb, high-protein diet to help his ulcerative colitis. Dkt. 1 at 5. But the evidence shows that medical staff requested just such a diet, and it was rejected by the regional medical director as not medically necessary. Dkt. 69-28 at 1. Indeed, Mr. Garland acknowledged in his deposition that Dr. Ippel had tried to get him a low-carb, high-protein, renal diet. Dkt. 69-30 at 31 ("I have seen that Dr. Ippel did put in the request, but the regional medical director denied it."). Because Dr. Ippel tried to help Mr. Garland get the diet he requested—along with several other diets he has tried with varying degrees of success—Dr. Ippel is entitled to summary judgment on this claim.

## IV. Conclusion

Corizon's motion for summary judgment, dkt. [63] is **granted**. Wexford and Dr. Ippel's motion for summary judgment, dkt. [67], is **granted** as to Mr. Garland's diet claim against Dr. Ippel but **denied** as to Mr. Garland's medicated wipes claim against Wexford.

The **clerk is directed** to terminate Corizon Inc. and Dr. Bruce Ippel as defendants on the docket. This case shall proceed to trial or settlement on the medicated wipes claim against Wexford.

**IT IS SO ORDERED.**

Date: 1/24/2020

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

KENNETH GARLAND
143353
NEW CASTLE – CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Adam Garth Forrest
BOSTON BEVER KLINGE CROSS & CHIDESTER
aforrest@bbkcc.com

Adriana Katzen
BLEEKE DILLON CRANDALL ATTORNEYS
adriana@bleekedilloncrandall.com

Britney Jade McMahan
KATZ  KORIN CUNNINGHAM, P.C.
bmcmahan@kkclegal.com

Jarod Zimmerman
KATZ  KORIN CUNNINGHAM, P.C.
jzimmerman@kkclegal.com